**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

ANGELA W.,[1]
     Plaintiff,

       v.                                 Civil No. 3:21-cv-00550 (MRC)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
     Defendant.

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for a period of disability and disability insurance benefits under the Social Security Act ("Act"). At the time of her application date, Plaintiff was forty-five years old and previously worked as a cost analyst. (R. at 208, 220.) Plaintiff alleges she is unable to work due to post-traumatic stress disorder, anxiety, major chronic depression, degenerative joint disease of the lower spine, a herniated disc, lumbar radiculopathy, and chronic migraines. (R. at 241.)

On May 21, 2021, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 12-30.) This matter comes before the Court by consent of the parties (ECF No. 29) pursuant to 28 U.S.C. § 636(c)(1), on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as

Plaintiff now seeks review of the ALJ's decision. (Pl.'s Mem. Supp. Mot. Summ. J. 1, ECF No. 21 ("Pl.'s Mem.").) For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 20), GRANTS Defendant's Motion for Summary Judgment (ECF No. 25) ("Def.'s Mem."), and AFFIRMS the final decision of the Commissioner.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on October 23, 2019, alleging disability beginning September 6, 2019. (R. at 208-09.) The SSA denied Plaintiff's claim initially and upon reconsideration. (R. at 83, 101.) Plaintiff requested a hearing before an ALJ, and a hearing was held telephonically on May 12, 2021. (R. at 35-68, 112-13.) On May 21, 2021, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 15-30.) On June 24, 2021, the SSA Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.

---

Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. *Id.* § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* § 404.1520(a)(4)(ii).

Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. *Id.* § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-30.) *See* 20 C.F.R. § 404.1520(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity[3] since the alleged disability onset date, September 6, 2019. (R. at 17.) At step two, the ALJ

---

[3] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or

4

determined that during the relevant period, Plaintiff suffered from the following severe impairments: "post-traumatic stress disorder (PTSD), anxiety, depression, degenerative disc disease of the spine, and arthritis of the hand and knee (20 CFR 404.1520(c))." (R. at 17.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526). (R. at 18.)

The ALJ then determined Plaintiff's residual functional capacity.[4] (R. at 22.) Based on the evidence in the record, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following exceptions:

> [Plaintiff] is able to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. She is able to stand and/or walk six hours in an eight-hour workday and sit six or more hours in an eight-hour workday. She is able to frequently climb ramps and stairs, occasionally climb ladders, but never climb ropes and scaffolds. [Plaintiff] is able to frequently balance, stoop, kneel, crouch and crawl. She is able to understand, remember and carry out simple and routine work related instructions, and concentrate for periods of two hours on work related tasks before requiring a break. She is able to work with the general public, coworkers, and supervisors occasionally. [Plaintiff] is able to perform non-production pace/non-assembly line pace jobs with occasional workplace changes introduced gradually over time, and occasional decision-making and no responsibility for the safety of others.

---

hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[4] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

(R. at 22.) The ALJ explained that he determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," in accordance with the regulations. (R. at 22.)

Based on his residual functional capacity findings, the ALJ concluded at step four that Plaintiff was not capable of performing past relevant work as an operation research analyst. (R. at 28.) At step five, the ALJ found that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 29.) The ALJ considered the testimony of a vocational expert, who opined that Plaintiff could perform the requirements of representative occupations such as garment sorter, laundry sorter, and cleaner. (R. at 29.) Therefore, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 30.)

## IV. ANALYSIS

In challenging the ALJ's decision, Plaintiff argues two errors warrant the direct calculation of benefits, or, in the alternative, remand. (Pl.'s Mem. at 1, 12.) First, she asserts that the ALJ's residual functional capacity determination is not supported by substantial evidence because the ALJ failed to properly evaluate the opinion evidence under the prevailing regulations and law. (Pl.'s Mem. at 1, 8-10.) Specifically, Plaintiff alleges that the ALJ failed to evaluate the psychological evaluation reports completed by James B. Wade, PhD, LCP ("Dr. Wade") and Salmaan Khawaja, PsyD ("Dr. Khawaja") as "medical opinion evidence" pursuant to the regulatory framework. (R. at 8-10.) Defendant responds that the ALJ was not required to assess the persuasiveness of these reports because they did not constitute "medical opinion evidence" under the controlling regulations. (Def.'s Mem. at 10-15.) In her Reply Brief, Plaintiff contends that the reports of Dr. Wade and Dr. Khawaja constitute medical opinion evidence because each

report contains: "(1) a medical opinion (2) from a medical source (3) about what Plaintiff can still do despite her impairments and (4) whether she has one or more impairment-related limitations or restrictions in the [abilities listed in 20 C.F.R. § 404.1513(1)(2)(ii)]." (Pl.'s Reply Br. at 2, ECF No. 28).

Second, Plaintiff alleges that the ALJ erred by declining to find her bladder impairment to be a severe impairment, and subsequently failed to consider it, as required by the regulations, when assessing Plaintiff's residual functional capacity. (Pl.'s Mem. at 10-12). Defendant responds that the ALJ correctly assessed Plaintiff's bladder impairment to be non-severe because the record does not evince that "'this impairment had more than a minimal effect on [Plaintiff]'s functional capabilities for the 12-month durational requirement of the regulations.'"(Def.'s Mem. at 17, citing R. at 18.)

**A.    The ALJ Did Not Err in His Residual Functional Capacity Assessment When He Evaluated the Statements of Dr. Wade and Dr. Khawaja.**

*1.   Evaluating Medical Opinion Evidence for Claims Filed on or After March 27, 2017.*

The regulations provide a framework for how an ALJ must evaluate medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. § 404.1520c. They specify that the ALJ will no longer "give any specific evidentiary weight . . . to any medical opinion(s) . . . ." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; *see* 20 C.F.R. § 404.1520c(a). Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. § 404.1520c(a), (b).

Under the regulations,[5] the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id.* § 404.1520c. Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered in the written opinion. *Id.* § 404.1520c(b)(2). Supportability and consistency are explained in the regulations:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2). The ALJ may, but is not required to, explain how the other factors were considered. *Id.* § 404.1520c(b)(2). However, when two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. *Id.* § 404.1520c(b)(3).

---

[5] Plaintiff filed her disability claim after March 27, 2017. As a result, Section 416.920c, which sets forth revised rules regarding the assessment of medical opinion evidence, applies here.

The regulations explain what qualifies as a "medical opinion" for purposes of the ALJ's decision: a medical opinion is a "statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in her ability to perform work or adapt to environmental conditions. *Id.* § 404.1513(a)(2). A medical opinion does not include "judgments about the nature and severity of [the claimant's] impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id.* § 404.1513(a)(3). The regulations put such evidence in the category of "other medical evidence" as opposed to "medical opinion."[6] *Id.* While the regulations impose articulative duties pertaining to medical opinions on the ALJ, they do not impose such duties with respect to other medical evidence. *See id.* §§ 404.1513(a), 404.1520c.

### 2.  Dr. Wade's Psychological Evaluation Note.

Dr. Wade completed a "psychology established visit note" following a neuropsychological evaluation of Plaintiff on September 9, 2019. (R. at 337.) He noted that Plaintiff: (1) was referred to him "to evaluate cortical functions, provide a description of personality, and to aid in diagnosis and treatment planning[;]" and (2) "present[d] a history of a decline in her neurobehavioral functioning," and "identifie[d] a decline in memory and attentional skill beginning 6 months ago." (R. at 337.) Dr. Wade then documented Plaintiff's physical health complaints and medicine regimen, which included "sumatriptan, Wellbutrin, Zoloft, and clonazepam." (R. at 337.)

---

[6] The categories of evidence established in § 404.1513 are: (1) objective medical evidence, such as test results or imagery; (2) medical opinion; (3) other medical evidence; (4) evidence from nonmedical sources; and (5) prior administrative findings, such as the results of earlier appeals within the SSA.

Additionally, Dr. Wade noted Plaintiff's activities of daily living, which included working full time as an analyst, preparing meals, driving, shopping, and doing yard work. (R. at 337.) Dr. Wade remarked that while "there [was] no prior history of recreational substance abuse or legal problems," he recorded Plaintiff's history of sexual trauma while serving in the military. (R. at 337-38.) As a result, according to Dr. Wade, Plaintiff "developed posttraumatic stress disorder" and "continue[d] to wrestle with nightmares, flashbacks of the abuse, and attempt[ed] to avoid cues or thoughts that remind her of the trauma, including avoiding TV shows that depict violence against women." (R. at 338.) Plaintiff reported "a sense of limited or foreshortened future, startle response, and hypervigilance." (R. at 338.) Additional symptoms included depression, sleep disturbance, fatigue, attention deficit, social withdrawal, feelings of hopelessness, helplessness or worthlessness, occasional crying spells, and a decline in libido. (R. at 338.) Further, Plaintiff reported that she "has withdrawn socially and typically stay[ed] on her 14-acre farm, where she has 3 horses and 3 goats as well as several cats and dogs." (R. at 338.)

In addition to her reported symptoms, Dr. Wade documented Plaintiff's family, marital, and work history. (R. at 338.) He discussed how Plaintiff was triggered by military places and personnel but was able to work remotely from home for four out of five days per week. (R. at 338.) However, Plaintiff reported feeling an uptick in her anxiety and experienced an increase in panic attacks as a result of a new supervisor who was "attempting to reverse [Plaintiff's] permission to work from home." (R. at 338.) Consequently, Plaintiff attributed the onset of her attention and memory difficulties to this period, "when she began this new job placement." (R. at 338.)

During the evaluation, Dr. Wade documented Plaintiff's mental status, which he found to be "cooperative," but "sad and anxious." (R. at 338.) "Her affect consisted of constricted range with increased intensity," and she displayed mild agitation. (R. at 338.) He found she had normal

speech, no psychotic features, denied homicidal or suicidal ideation, was in no pain, and reported adequate sleep and diet. (R. at 338-39.) Dr. Wade proceeded to administer a series of tests to evaluate Plaintiff's language, communication, special, motor, attention/concentration, and learning skills, as well as assess her memory, executive and personality functioning. (R. at 339-42.) He recorded his findings in these areas, noting that the results may have been impacted by "emotional turmoil at the time of testing." (R. at 341.) "For example, on measures of visual memory, her performance varied from being in the mildly impaired to high average range." (R. at 343.) According to Dr. Wade, Plaintiff's "degree of emotional turmoil will interfere with [Plaintiff]'s ability to fully capitalize on her cognitive resources, resulting in a pseudo-dementia" and "will make it difficult for [her] to meet everyday stress and responsibility. Based on these data, [Plaintiff] may benefit from seeking family medical leave (FMLA) from work due to neurobehavioral decline." (R. at 341-42.) He added that "when emotional turmoil intensifies, panic attacks and headaches occur." (R. at 342.)

Dr. Wade diagnosed Plaintiff with memory loss, major depression without psychosis, post-traumatic stress disorder, and panic disorder. (R. at 343.) In terms of treatment, Dr. Wade noted that "[d]ue to the severity of [Plaintiff]'s depression, she should apply for FMLA" and recommended that she undergo psychotherapy and a re-assessment of her medicine regimen. (R. at 343.) He noted that, "[w]ith remission of depression and post-traumatic stress disorder related symptomology, [Plaintiff] will likely enjoy improved cognitive function and quality of life." (R. at 343.)

> 3. *Substantial Evidence Supports the ALJ's Consideration of Dr. Wade's Evaluation Note.*

In his written decision, the ALJ thoroughly summarized Dr. Wade's psychological evaluation findings as part of the medical evidence. (R. at 23.) However, the ALJ did not evaluate

the persuasiveness of Dr. Wade's findings in accordance with the regulations governing medical opinion evidence, which Plaintiff contends is reversible error. (Pl.'s Mem. at 9-10.) Plaintiff alleges that, had the ALJ considered Dr. Wade's findings as a medical opinion, and properly weighed it in accordance with the regulations, the disability determination outcome would have been different. (Pl.'s Mem. at 10.) Defendant argues, in response, that Dr. Wade's statements do not constitute a "medical opinion" as defined in the regulations because they fail to "indicate a limitation or restriction," and simply amount to "observations from the examination[.]" (Def.'s Mem. at 14.)

Upon review, the undersigned finds Dr. Wade's psychological evaluation note constitutes "other medical evidence" because it describes "judgments about the nature and severity of [Plaintiff's] impairments, [her] medical history, clinical findings, diagnosis, treatment prescribed with response, [and] prognosis." 20 C.F.R. § 404.1513(a)(3), *see also Ira C.T. v. Kijakazi*, No. 3:20-cv-980 (DJN), 2022 U.S. Dist. LEXIS 154333, at *13 (E.D. Va. June 27, 2022) *R&R adopted by Ira C.T. v. Kijakazi*, 2022 U.S. Dist. LEXIS 154318, 2022 WL 3702252, at * 1 (E.D. Va. Aug. 26, 2022) (finding a treatment note regarding judgments about the nature and severities of the impairment, prognosis, and treatment not to be a medical opinion under the regulations.)

Indeed, Dr. Wade's findings: (1) memorialize Plaintiff's subjective complaints; (2) record her results on diagnostic examinations and tests; (3) reflect Dr. Wade's "Treatment Implications[;]" (4) detail a diagnosis; (5) record Plaintiff's mental status; (6) set forth clinical findings; (7) prescribe treatment; and (8) include judgments about the nature and severity of Plaintiff's impairments, such as Plaintiff's depression and memory deficits. (R. at 342-43.) Further, the evaluation note omits any statements about Plaintiff's ability to perform physical, mental, and other demands of work activities with specificity that would allow the ALJ insight into the extent

to which Plaintiff's mental impairments hinder her ability to perform these activities. *See id.* § 404.1513(a)(2)(i)(A)-(D). For example, although Dr. Wade remarked that "due to the severity of [Plaintiff]'s depression, she should apply for FMLA[,]" this statement fails to provide the ALJ with detail about the extent to which Plaintiff can: (1) understand; (2) remember; (3) maintain concentration, persistence, or pace; (4) carry out instructions; or (5) respond appropriately to supervision or work pressures in a work setting. (R. at 343) *See* 20 C.F.R. § 404.1513(a)(2)(ii).

Accordingly, the ALJ was not required to articulate how persuasive she found Dr. Wade's evaluation note because it constituted "other medical evidence." *See id.* § 404.1513(a)(3). In accordance with the regulations, the ALJ explained that he made his residual functional capacity determination "[a]fter careful consideration of the entire record." (R. at 22.) Accordingly, the Court finds that the ALJ did not err in declining to specifically evaluate Dr. Wade's findings as a medical opinion.

### 4. *Dr. Khawaja's Neuropsychological Evaluation Report.*

Plaintiff attended a psychological evaluation with Dr. Khawaja on referral from her internist in June 2020. (R. at 588.) Dr. Khawaja subsequently evaluated Plaintiff on July 31, 2020, and explained that he "would evaluate [Plaintiff] and recommend diagnostics and treatment based on [his] assessment and impressions . . . ." (R. at 610.) Like Dr. Wade, Dr. Khawaja recorded Plaintiff's personal, employment, and medical history. (R. at 610-11.) He noted Plaintiff's history of trauma, diagnoses, and subjective complaints. (R. at 610, 616.) For example, Plaintiff reported having migraines, "episodes of passing out," and that "[t]hings were not getting any better." (R. at

610.) She also reported memory problems, inconsistent diet and sleep, panic attacks, and difficulties focusing and learning. (R. at 610-11.)

On mental status examination, Dr. Khawaja found that Plaintiff's mood, affect, gait, appearance, dress, language, motor, comprehension, insight, and judgment were within normal limits. (R. at 611.) Plaintiff reported a history of suicidal ideation but denied any current thoughts. (R. at 611.) She had no cognitive or motor perseveration and was noted to be a good historian. (R. at 611.)

Dr. Khawaja then proceeded to perform a series of neuropsychological assessments. (R. at 613-15.) He provided his "Impressions & Recommendations," in which he noted Plaintiff's "severe levels of depression and severe levels of anxiety," as well as "severe levels of PTSD with trauma specific dissociation." (R. at 616.) Although Plaintiff had impairments in verbal fluency, confrontation naming, and sustained attention, her visual learning and memory abilities were normal. (R. at 615.) Nonetheless, Plaintiff showed "severe complex, and multifaceted psychiatric distress" which Dr. Khawaja estimated would "significantly impair with her day-to-day ability to focus and concentrate, especially when trying to learn new information." (R. at 616.) According to Dr. Khawaja, "the majority of her neurocognitive deficits are secondary to psychiatric distress. This is reassuring from an organic standpoint and concerning from a functional standpoint." (R. at 616.)

Based on these findings, Dr. Khawaja recommended "continued medical care" and "a review of her current psychiatric medication management for anxiety and depression. Active engagement in intensive individual and group psychotherapy may prove quite helpful for her. Consider [Eye Movement Desensitization and Reprocessing]. Consider [cognitive behavioral therapy]." (R. at 616.) Further, Dr. Khawaja recommended "appropriate medication for attention,"

and "[o]nce her mood improves, [he] would like her reevaluated to get a better sense as to the underlying and atypical auditory memory scores that she generated." (R. at 616.) Notably, Dr. Khawaja was "not concerned about competency, driving, day-to-day supervision, etc.," nor did he "see her as malingering." (R. at 616.) Dr. Khawaja encouraged Plaintiff "to remain mentally, physically, and socially active as possible." (R. at 616.)

5. *Substantial Evidence Supports the ALJ's Consideration of Dr. Khawaja's Evaluation Note.*

In his written decision, the ALJ considered Dr. Khawaja's neuropsychological evaluation and gave an extensive summary of its findings. (R. at 25.) The ALJ explained the results of Dr. Khawaja's assessments and diagnoses. (R. at 25.) However, like Dr. Wade's evaluation report, the ALJ did not evaluate the persuasiveness of Dr. Khawaja's findings, which Plaintiff contends is reversible error. (Pl.'s Mem. at 9-10.) Defendant contends that Dr. Khawaja "did not render an opinion of [Plaintiff]'s mental abilities." (Def.'s Mem. at 14.) Consequently, because Dr. Khawaja's evaluation was not a "medical opinion" as defined in the regulations, the ALJ had no articulative duty to weigh the persuasiveness of Dr. Khawaja's findings. (Def.'s Mem. at 13-14.)

The Court agrees with Defendant that Dr. Khawaja's neuropsychological evaluation was not a "medical opinion" as defined in the regulations. *See* 20 C.F.R. § 404.1513(a)(2). Instead, Dr. Khawaja's evaluation constitutes "other medical evidence." *Id.* § 404.1513(a)(3). Like Dr. Wade's evaluation note, Dr. Khawaja's neuropsychological evaluation note fails to indicate what Plaintiff could still do despite her impairments or what specific limitations her impairments caused. *See id.* § 404.1513(a)(2). For example, according to Dr. Khawaja, "the majority of [Plaintiff's] neurocognitive deficits are secondary to psychiatric distress. This is reassuring from an organic standpoint and concerning from a functional standpoint." (R. at 616.) However, Dr. Khawaja declined to specify the functional limitations resulting from Plaintiff's impairments that impact

15

her ability to perform physical, mental, or other demands of work activities. *See* 20 C.F.R. § 404.1513(a)(2)(i) (A)-(D).

Moreover, Dr. Khawaja's evaluation note reflects Plaintiff's medical, work, education, and family history, records Plaintiff's mental status at the time of the assessment, and details Plaintiff's results from various neuropsychological testing. (R. at 610-15.) Dr. Khawaja recorded his diagnoses and provided his "Impressions & Recommendations" in which he explained that Plaintiff reported "severe levels of PTSD with trauma specific dissociation." (R. at 615-16.) Such information pertaining to "the nature and severity of [Plaintiff's] impairments, [her] medical history, clinical findings, and diagnosis" constitutes "other medical evidence" under the regulations. *See* C.F.R. § 404.1513(a)(3). In short, Dr. Khawaja's evaluation note fails to explain how Plaintiff's impairments would affect her ability to perform the mental demands of work activities and the extent to which she can perform them. As a result, Dr. Khawaja's psychological evaluation note did not trigger any articulative duty for the ALJ beyond considering it as part of the overall medical record evidence. *See Eric E. v. Comm'r of Soc. Sec.*, Civil Action No. 2:21-cv-398, 22 U.S. Dist. LEXIS 91435, at *38-39 (E.D. Va. Mar. 11, 2022) *R&R adopted Eric E. v. Kijakazi*, No. 2:21cv398, 2022 U.S. Dist. LEXIS 164439, at *1 (E.D. Va. Sep. 12, 2022) (finding "opinions dealing with prognosis, not work ability, and do not constitute medical opinions under the regulations.") Therefore, the ALJ did not err when he declined to address Dr. Khawaja's evaluation note as a medical opinion.

**B.      The ALJ Did Not Err When He Found Plaintiff's Bladder Impairment to be a Non-Severe Impairment and Substantial Evidence Supports His Residual Functional Capacity Findings**.

Next, Plaintiff alleges that the ALJ erred by finding her bladder impairment a non-severe impairment at step two of the sequential evaluation.  (Pl.'s Mem. at 1, 10-11.) Plaintiff argues that

the ALJ did not fully account for how "her bladder dysfunction significantly impacts her life" and requires her to take "additional time off-task . . . to deal with her urinary incontinence." (R. at 10-11.) Further, according to Plaintiff, the ALJ insufficiently explained why he found Plaintiff's bladder impairment to be non-severe, but "simply conclude[d] without any explanation that 'there are no indications from the evidence of record that this impairment had more than a minimal effect on [Plaintiff]'s functional capabilities." (Pl.'s Mem. at 11, citing R. at 18.)

Defendant responds that the ALJ "fully considered this impairment in his discussion of the evidence and reasonably explained that Plaintiff was not entitled to greater limitations than those the ALJ assessed." (Def.'s Mem. at 16.) Moreover, Defendant notes that "[a]lthough Plaintiff testified to severe incontinence, there is simply no support for this in the record." (Def.'s Mem. at 17.) Specifically, "the only references to urinary urgency appear in visits during which Plaintiff was diagnosed with urinary tract infections and her symptoms resolved with antibiotic treatment." (Def.'s Mem. at 17, citing R. at 426, 430, 437, 440, 448, 452, 641-42.) Defendant also points out that the medical records from Plaintiff's last appointment during the relevant time period reflected that she was "without complaint and satisfied with her urinary status." (R. at 647.) As a result, Defendant argues substantial evidence supports the ALJ's determination that Plaintiff's bladder impairment was not severe. (Def.'s Mem. at 17.)

*1. Legal Standard.*

At step two, an ALJ must consider a claimant's medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). "The Supreme Court has held that this step of the disability evaluation is a *de minimis* threshold." *Williams v. Astrue*, 2010 WL 395631, at *14 (E.D. Va. Feb. 2, 2010), *report and recommendation adopted*, at *1 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 (1987)). An ALJ satisfies step two by finding a severe impairment and proceeding through the rest of the

sequential analysis.  *See McCormick v. Soc. Sec. Admin., Comm'r*, 619 F. App'x 855, 858 (11th Cir. 2015); *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.")  A claimant has the burden of demonstrating that he has an "impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); *Bowen*, 482 U.S. at 146.  The claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509.

A severe impairment causes more than a minimal effect on one's ability to work. § SSR 85-28, 1985 WL 56856 at *3 (1985) (Program Policy Statement; Titles II and XVI: Medical Impairments That Are Not Severe). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). In other words, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a). An ALJ will find a claimant not disabled at step two if she "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement." *Id.* § 404.1520(a)(4)(ii).

Further, under 20 C.F.R. § 404.1523, the ALJ must consider the combined effect of all of a claimant's impairments "without regard to whether any such impairment, if considered

separately, would be of sufficient severity." 20 C.F.R. § 404.1523. "Thus, the issue of whether or not a particular impairment is found severe is only critical if the ALJ finds no severe impairment and ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity." *Miller v. Astrue*, No. 8:10-1142-HMH-JDA, 2011 U.S. Dist. LEXIS 45262, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011). Consequently, any error by an ALJ at step two is harmless if the ALJ considers the effects of all of the claimant's impairments in the subsequent steps. *See Brooks v. Astrue*, No. 5:10CV00104, 2012 U.S. Dist. LEXIS 41295, 2012 WL 1022309, at *12 (W.D. Va. Mar. 26, 2012) (citing *Miller*, 2011 U.S. Dist. LEXIS 45262, 2011 WL 1576203, at *15); *see also Gaskins v. Comm'r*, No. WDQ-13-1470, 2014 U.S. Dist. LEXIS 31710, 2014 WL 979205, at *5 (D. Md. March 12, 2014); *Hammond v. Astrue*, No. TMD 11-2922, 2013 U.S. Dist. LEXIS 29730, 2013 WL 822749, at *2 (D. Md. March 5, 2013).

   *2. Substantial evidence supports the ALJ's finding that Plaintiff's bladder impairment was not severe.*

   Upon review, the ALJ sufficiently considered the longitudinal medical record and Plaintiff's testimony when evaluating the severity of her bladder impairment, and adequately explained his decision to find it a non-severe impairment. (R. at 17-18.) First, the ALJ addressed the medical records regarding Plaintiff's bladder cancer, noting that Plaintiff "continued to have a little bit of dysuria that was improving and her urine test was negative" following a bladder tumor operation. (R. at 18.) The ALJ acknowledged that Plaintiff sought and received treatment for her bladder cancer but determined that it had no more than a minimal effect on her functional capabilities for the twelve-month durational period required by the regulations. (R. at 18.) Specifically, the ALJ explained that a "treatment note from Virginia Urology dated July 8, 2020 indicate[d] that results from pathology were reviewed, which showed non-invasive low-grade

19

papillary urothelial carcinoma." (R. at 18.) Nonetheless, Plaintiff's symptoms reportedly improved. (R. at 18.) Subsequently, the ALJ found that the medical record did not "reflect significant treatment for this condition during the period at issue." (R. at 18.)

Second, the ALJ considered Plaintiff's activities of daily living. (R. at 20.) Plaintiff told the ALJ that her activities of daily living included taking care of a minor child and animals on her farm, gardening, going outside, driving a car, shopping in stores , buying groceries, preparing meals, performing household chores, cleaning the house, and caring for her personal hygiene and other needs. (R. at 20-21, 26.) She testified that she painted, took her own medications without reminders, managed her finances, and enjoyed being outside. (R. at 20, 26.)

Third, the ALJ accounted for the medical opinion evidence, which contained no indications "from treating or examining physicians stating that [Plaintiff] was unable to work permanently." (R. at 26.) Specifically, the ALJ noted that the medical opinions of Neil Sreshta, M.D. and Jeremy Ravussin, M.D. ("Dr. Ravussin") were persuasive because they were supported in the record. (R. at 27.) In contrast, the ALJ found the opinion of Deborah Daniel, LCSW not persuasive because she "provided no comments, detailed explanations or additional information on the form," nor was it "entirely supported in the record." (R. at 28.) The ALJ also reviewed the state agency doctors' opinions, finding them "partially consistent with the medical evidence of record" and well-supported with explanations "based on their reviews of the medical evidence . . . ." (R. at 27.) Notably, none of the medical opinions indicated that Plaintiff's bladder impairment significantly impaired her ability to perform work-related activities.

Ultimately, Plaintiff bears the burden of proving that her bladder impairment was a severe impairment that prevented her from engaging in substantial gainful activity. *See Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986). Plaintiff argues that this case is analogous to the claimant in

20

*Thomas v. Saul*, Case No. 3:18-cv-700 (JAG), 2019 U.S. Dist. LEXIS 137259 (E.D. Va. July 25, 2019). In that case, the district court found that the ALJ erred by failing to explain how the claimant's history of bladder dysfunction "had only a minimal effect on her ability to function." *Id*. at *13. Such error was not harmless, according to the Court, because the ALJ failed to account for the claimant's urinary incontinence when formulating the residual functional capacity. *Id.* at *16. For instance, the ALJ addressed the medical opinion evidence as to the urologist's assessed postural limitations, but not the alleged time off task resulting from unscheduled bathroom breaks and the claimant's need to clean up and change her clothing. *Id.*

This present case is not sufficiently analogous to *Thomas* as to warrant remand. First, the claimant in *Thomas* presented evidence from her urologist detailing specific functional limitations and time off-task as a result of her urinary incontinence. *Id.* Second, this Court determined that the ALJ in *Thomas* failed to explain the alleged inconsistencies between the claimant's subjective complaints and the medical evidence. *Id.* However, in the instant matter, Plaintiff did not present sufficient evidence showing that her bladder impairments resulted in functional limitations that significantly impacted her ability to perform work-related activities. Indeed, Plaintiff does not point to any particular evidence that she claims the ALJ overlooked, but merely asserts that the ALJ should have incorporated "limitations caused by Plaintiff's bladder dysfunction" regardless of whether the record supported any such limitations. (Pl.'s Mem. at 12.) Although Plaintiff and her attorney discussed her bladder impairment at the hearing, including her need to change her clothing as a result of accidents and frequent need to use the restroom, a finding of "severe" requires the ALJ to evaluate the entire record to determine whether this impairment caused more than a "minimal effect" on Plaintiff's ability to work for the requisite twelve-month durational period. § 404.1520(c).

Upon review, the undersigned finds that Plaintiff did not meet her burden of proving that her bladder impairment was a severe impairment pursuant to the requirements in the regulations. While various medical treatment notes described Plaintiff's visits for urinary tract infections, these symptoms were resolved with prescribed antibiotics. For instance, Plaintiff visited Dr. Ravussin on March 31, 2020 "for [b]lood in [u]rine; [u]rinary [r]etention; and [u]rinary [f]requency[.]" (R. at 426.) Although she had no flank pain, fever, chills, nausea or vomiting, Plaintiff described "cloudy/foul smelling" urine. (R. at 427.) Dr. Ravussin prescribed antibiotics and advised her to follow up if her symptoms worsened. (R. at 430.) On May 13, 2020, Plaintiff returned to Dr. Ravussin and reported urine frequency, urgency, mild flank pain, and lower back pain. (R. at 437.) Dr. Ravussin diagnosed her with a "partially treated [urinary tract infection]" and prescribed antibiotics. (R. at 440.) Weeks later, on May 28, 2020, Plaintiff presented to Dr. Ravussin again and reported that "her urinary symptoms as well as her lower back pain completely cleared up." (R. at 449.) However, Plaintiff was experiencing "a recurrence of hematuria" and reported a "dull ache to the bilateral back." (R. at 449.) Dr. Ravussin prescribed medication and suggested that she may need to consult a urologist if her symptoms persisted. (R. at 452.)

Subsequently, Plaintiff presented at Virginia Urology on June 8, 2020 "for gross hematuria" and back pain. (R. at 473.) Plaintiff agreed to imaging and was prescribed medication. (R. at 474.) On June 10, 2020, Plaintiff presented again for "gross hematuria follow up." (R. at 467.) Imaging showed "no urinary tract calculi. No hydronephrosis or hydroureter. No enhancing renal masses. Subcentimeter right midpole hypodensity is too small to characterize but statistically likely represents a cyst." (R. at 467.) According to the urologist, Plaintiff had "a 2.5 centimeter polypoid enhancing bladder mass just lateral to the right ureteral orifice with frond-like

projections, consistent with transitional cell carcinoma. [Plaintiff] agrees to [trans urethral resection of bladder tumor] with gemcitabine." (R. at 468.)

On July 8, 2020, Plaintiff presented to Virginia Urology "for [trans urethral resection of bladder tumor] post-op" and reported that she continued "to have a little bit of dysuria since the procedure but sa[id] it's improving." (R. at 639.) Plaintiff also reported that her back pain had "completely resolved since her procedure too which she's very pleased about." (R. at 639.) She was told that the dysuria would resolve and to follow up in three months. (R. at 640.)

On September 2, 2020, Plaintiff returned to Dr. Ravussin after "having had a week of frequency and then burning of urination." (R. at 641.) Dr. Ravussin prescribed medication and retrieved a urine sample for analysis. (R. at 642.) On October 7, 2020, Plaintiff reported "burning at the end of her stream and increased sensitivity" but reported feeling "better after antibiotics. Her urine [was] clear . . . ." (R. at 643.) A cystoscopy showed no abnormal strictures or lesions. (R. at 644.) Plaintiff next followed up with Dr. Rollins on January 11, 2021, reporting clear urine and denying involuntary urine loss. (R. at 646-47.)

As the record indicates, Plaintiff's medical providers do not note any ongoing incontinence or frequent urination as a result of her bladder cancer, but documented, instead, Plaintiff's ongoing urinary tract infections that, ultimately, resolved to her satisfaction. (R. at 465-78, 639-47.) Indeed, Plaintiff presented at her January 2021 appointment "without complaint," regarding her bladder impairment, which was nearly five months before her hearing, and did not provide evidence of further treatment. (R. at 647.) Therefore, the undersigned finds that the ALJ did not err when he found that Plaintiff's bladder impairment was not a severe impairment on the basis that it had no more than a minimal effect on her functional capabilities for the twelve-month durational period. (R. at 18.) As a result, substantial evidence supports the ALJ's residual functional capacity

findings, which provided functional limitations consistent with Plaintiff's assessed ability to perform work-related activities based on the available evidence in the record. (R. at 22.)

## V. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 20), GRANTS Defendant's Motion for Summary Judgment (ECF No. 25), and AFFIRMS the final decision of the Commissioner.

Let the clerk forward a copy of this ORDER to all counsel of record.

_____  /s/  MRC
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: December 12, 2022